# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

TONY WALKER,

    Defendant.

Case No. 23-cr-1001-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## I. INTRODUCTION

On January 6, 2023, a Complaint was filed against Defendant Tony Walker charging him with Possession of a Firearm by a Felon. (Doc. 2.) On February 7, 2023, the Grand Jury returned an Indictment, charging Defendant with one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. Sections 922(g)(1). (Doc. 18.)

The matter before me is Defendant's motion to suppress. (Doc. 28.) The motion contained an inventory of items to be suppressed which includes a Taurus PT111 9mm handgun and 12 rounds of ammunition. (Doc. 28 at 1 and Doc. 34.) The Government timely filed a response. (Doc. 36.) The Honorable C.J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on April 18, 2023. (Doc. 37.)

The motion arises from law enforcement's stop and subsequent search of Defendant's person outside a bus stop in Dubuque, Iowa, after law enforcement had received a tip that Defendant was transporting firearms and drugs.

At the hearing, the following Government exhibits were admitted without objection:

1

1. Dubuque County Sheriff's Office Case Supplemental Report for an incident that occurred on October 5, 2022 (eight pages), filed at Doc. 36-1; and

2. Sergeant Williams's body camera video;

Defendant seeks to suppress the firearm and ammunition found on his person on October 5, 2022. (Doc. 28.)

At the hearing, the following defense exhibits were admitted without objection:

A. Audio of 911 call;

B. Dubuque County Sheriff's Office Case Supplemental Report for an incident that occurred on October 5, 2022 (one page), filed at Doc. 28-1;

C. Body camera video; and

D. Documents regarding the criminal record of the caller described below[1] (Exhibits D-1 through D-11), filed at Doc. 35.

The Government called one witness: Sergeant Adam Williams. I found the witness credible. For the following reasons, I respectfully recommend that the District Court deny Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

On October 5, 2022, the Dubuque County, Iowa law enforcement dispatcher service (sometimes "dispatch") informed Sergeant Williams that it had received an anonymous call with information that an individual would be arriving in Dubuque, Iowa, by bus transporting guns and drugs.[2] (Williams Hr'g Test. at 3.) Specifically, the anonymous caller told the dispatcher that Defendant would be on the 10:30 a.m. bus from Chicago, Illinois to Dubuque. The caller stated that Defendant would be transporting guns and drugs. According to the caller, when Defendant arrived in Dubuque, he would

---

[1] I find it unnecessary to identify this caller by name.

[2] Sergeant Williams is employed by the Dubuque County Sheriff's Office. He is currently assigned to the Drug Task Force and has been its director for a little over one year. He has been in law enforcement since 2006 and is a graduate of the Iowa Law Enforcement Academy.

take an Uber from the bus station to a residence on East 22nd Street. (*Id.* at 4.) While the caller did not reveal his name to the dispatcher, the dispatcher had access to the caller's telephone number, which was also relayed to Sergeant Williams.

Sergeant Williams was able to identify the caller through law enforcement records showing the caller's telephone number. Sergeant Williams phoned the caller to speak with him and receive firsthand the information previously provided to the dispatcher. (*Id.*) Sergeant Williams recognized the caller's name and was familiar with the caller based on personal interaction with the caller and the caller's criminal history, which included drug possession, domestic assaults, firearms offenses, and a current investigation involving human trafficking. (*Id.* at 5, 16.) When he spoke with the caller, Sergeant Williams testified that he recognized the caller's voice based on prior interactions with the caller. The caller also recognized Sergeant Williams. They had a short back-and-forth conversation that confirmed that they knew each other. (*Id.* at 5.)

The caller relayed nearly identical information to Sergeant Williams as he had earlier reported to the dispatcher. Specifically, the caller told Sergeant Williams that the caller had known Defendant for a long time and considered him to be like a brother. The caller knew Defendant's residence and provided its address on East 22nd Street in Dubuque. The caller stated that Defendant had a drug problem and used PCP. The caller indicated that he had tried several times to get Defendant to change his ways and stop using drugs, but his attempts had failed, and he believed that the only way for Defendant to change was for him to be arrested. The caller also told Sergeant Williams that Defendant would be arriving in Dubuque on the 10:30 a.m. Trailways bus and Defendant would be transporting guns and drugs.[3] According to the caller, once Defendant arrived

---

[3] Sergeant Williams noted that if the Trailways bus travels directly from Chicago to Dubuque, it generally arrives at 10:30 a.m. However, if the bus makes a stop in Davenport, Iowa, before Dubuque, it generally arrives a later than 10:30 a.m. Here, the bus arrived in Dubuque later than 10:30 a.m. because it first stopped in Davenport. (Williams Hr'g Test. at 7.)

3

in Dubuque, he would take an Uber to his residence along with the guns and drugs. The caller also gave Sergeant Williams a description of Defendant.[4] (*Id.* at 6-7.) Additionally, the caller told Sergeant Williams that he knew Defendant would be on the bus with guns and drugs because he learned this information directly from Defendant.[5] (*Id.* at 9.)

After speaking with the caller, Sergeant Williams attempted to verify the information that the caller provided. First, Sergeant Williams called the Trailways bus office in Dubuque and inquired whether Defendant was on the October 5, 2022 Trailways bus from Chicago to Dubuque. The Trailways agent told Sergeant Williams that Defendant had purchased a ticket from Chicago to Dubuque and was scheduled to arrive between 11:00 a.m. and 11:45 a.m. on October 5, 2022. However, the Trailways agent stated that he could not verify that Defendant actually boarded the bus. Sergeant Williams also verified Defendant's residence through law enforcement records. Specifically, Sergeant Williams learned that there had been more than one incident involving Defendant at the address the caller gave as Defendant's residence. (*Id.* at 8.) One of the incidents involved an ambulance call to the residence. According to the dispatch notes, the ambulance personnel believed Defendant was under the influence of PCP. (*Id.* at 8, 16-18.) Further, Sergeant Williams ran Defendant's criminal history, which included convictions for being a felon in possession of a firearm, armed robbery, domestic assault, drug offenses, and being an armed habitual criminal. Defendant also had a non-

---

[4] The caller gave the following description of Defendant to Sergeant Williams: Approximately six-foot tall, black male with dark skin. (Williams Hr'g Test. at 7.) This is not a particularly detailed description, but it is not inaccurate.

[5] Sergeant Williams testified that "[t]he caller heard the information directly from Mr. Walker." (Williams Hr'g Test. at 10.) As discussed below, the means of communication between Defendant and the caller was not established. To the extent this constitutes a discrepancy, I find it minor and ultimately inconsequential. In everyday communication, people may say they have "heard" from someone by phone, text, email, or other forms of correspondence.

extraditable warrant from Indiana which would not provide a basis for police to arrest him in Dubuque. (*Id.* at 9, 52-53.) A summary of the factual information and the status of verification at the time of the stop may be helpful.

| Information Supplied by Caller | Verification by Law Enforcement |
|---|---|
| Tony Walker is on a Trailways bus from Chicago to Dubuque | Sgt. Williams verified a ticket was purchased by Defendant. His presence on the bus was verified before Defendant was seized. |
| Bus to arrive at 10:30 a.m. in Dubuque | The expected time was accurate, but a stop in Davenport delayed it. |
| Carrying guns and drugs | Not verified. Obtaining this information was, of course, the purpose of the stop and Defendant's possession of a firearm came after the stop. However, law enforcement did verify prior convictions that would make it illegal for Defendant to possess a firearm. |
| Taking an Uber to his residence | Not verified. Defendant was, however, walking in the direction of the reported residence. |
| Residence at specific address in Dubuque | An ambulance was called to the specific address where Defendant was encountered in the prior month. |
| Defendant's description | The description matched pictures obtained by law enforcement. |
| Known Defendant for a long time, like a brother | Not verified. |
| Needs to be arrested | This subjective assessment was not verified but is discussed below in more detail. |
| Defendant has a PCP problem | The above-referenced ambulance call was related to Defendant's suspected PCP use. |

As Defendant's counsel pointed out during cross-examination, there were aspects of the caller's report that were not verified, or could not be verified, which may have cast some suspicion on the veracity of the report. For example, the caller had a long and troubling criminal history (*see* Def. Exhibits D-1 to D-11) and was the subject of an on-going human trafficking investigation. Sergeant Williams knew something of the caller's criminal history but chose not to run it, even though he could have done so in about 15 minutes. The caller did not know the number or types of guns or the types of drugs Defendant was believed to be carrying.

Defendant also pointed out certain limitations on the facts Sergeant Williams considered to have been verified. For example, the reported PCP use by Defendant was

from a dispatcher's note of what was suspected by ambulance personnel. Sergeant Williams did not determine when the caller learned the information (so he could not determine if it was dated), how the information was communicated, or obtain Defendant's phone number from the caller.

Defendant also pointed out reasons to be suspicious of the caller's motives. For example, the caller's desire to remain anonymous, if ultimately futile, might be indicative of his desire to hide something. The caller reported that Defendant had shared information about his criminal activity (i.e., transporting guns and drugs). Defense counsel found it suspicious Defendant would have shared this information with the caller unless the caller was also involved in criminal activity. Similarly, the caller did not report how he knew Defendant was using PCP and the caller might have been involved in the use of illegal drugs—a possibility Sergeant Williams did not address with the caller.

Additionally, Defendant noted that assisting to arrange his arrest is a fairly drastic way for the caller to obtain help for him. Sergeant Williams had no information about what other steps the caller had pursued to help Defendant, if any. The caller's motive, defense counsel pointed out, might also seem suspect in light of the absence of recent convictions on Defendant's record. In other words, if such dire measures were necessary to obtain help for Defendant, one might expect more recent convictions.

After verifying the information provided by the caller, to the extent described above, Sergeant Williams held a briefing to discuss how law enforcement would "approach and eventually take [Defendant] into custody." (*Id.* at 10.) Sergeant Williams enlisted the help of other law enforcement agencies and departments to assist with setting up a perimeter around the bus station. Sergeant Williams and two other officers established surveillance at the bus station and waited for the bus to arrive. Approximately eight additional officers set up a three-block radius perimeter around the bus station. (*Id.* at 10.)

6

When the bus arrived, two individuals exited the bus. One of those individuals matched Defendant's description and was carrying a backpack. After exiting the bus, the individual tentatively identified as Defendant immediately started walking northbound toward East 22nd Street. Defendant was continuously observed from the time he left the bus and had no opportunity to dispose of anything. Sergeant Williams, along with two other officers, drove directly past the individual and all agreed that the individual was Defendant and the person identified by the caller.[6] The officers drove one block in front of Defendant and intended to approach him from that point. As Defendant approached the intersection at Elm Street and 13th Street, the officers ran up to Defendant, with their firearms drawn. The officers were wearing clothing identifying them as members of law enforcement. Sergeant Williams directed Defendant to the ground. Sergeant Williams grabbed Defendant's left wrist as he was going to the ground and another investigator took Defendant's right wrist. Defendant's arms were placed behind his back and he was handcuffed.

Sergeant Williams advised Defendant of his *Miranda* rights and then asked Defendant whether he had any weapons on him. Initially, Defendant denied having any weapons. After being told that he would be patted down, Defendant stated that he had a weapon on his person. Defendant told the officers that the weapon was on his right side in his belt/waistband. The officers located a 9mm Taurus handgun. (*Id.* at 10-15.)

---

[6] Sergeant Williams testified that, after speaking with the caller and prior to setting up surveillance at the bus station, he obtained four pictures of Defendant including pictures from the prison system and Defendant's driver's license. These pictures aided the officers in identifying Defendant outside the bus station. (Williams Hr'g Test. at 15.)

### III.    DISCUSSION

#### A.    *Parties' Arguments*

Defendant argues that the information provided by the caller had a low degree of reliability.  (Doc. 28-1 at 6.)  Specifically, Defendant argues that the information lacked significant predictive qualities.  (*Id.*)  Defendant also asserts that the information "was [not] contemporaneous with the observation of criminal activity."  (*Id.* at 8.)  Finally, Defendant contends that the "officers failed to sufficiently corroborate the low-reliability [information] provided by the caller."  (*Id.* at 9.)

The Government argues that law enforcement's stop of Defendant was justified by reasonable suspicion to conduct a stop under *Terry v. Ohio*, 392 U.S. 1 (1968).  (Doc. 36 at 4.)  The Government maintains that officers had reasonable suspicion that Defendant was a felon in possession of a firearm and possession of drugs based on the information from the caller and subsequent law enforcement corroboration.  (*Id.* at 6.)  The Government also argues that "because officers used reasonable force and did not unreasonably extend the duration of the *Terry* stop, . . . the stop was appropriate and did not become a de facto arrest requiring probable cause."  (*Id.* at 11.)

#### B.    *Relevant Law*

"The Fourth Amendment prohibits unreasonable . . . seizures by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest."  *United States v. Arvizu,* 534 U.S. 266, 273  (2002) (citing  *United States v. Cortez,* 449 U.S. 411, 417 (1981); *Terry v. Ohio,* 392 U.S. 1, 9 (1968)) (internal quotations omitted).  Officers may only conduct investigatory stops if they have reasonable suspicion that "criminal activity may be afoot."  *Id.* (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)); *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).  Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be

8

justified. *Patrick*, 776 F.3d at 954 (quoting *Cortez,* 449 U.S. at 417); *see also United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir. 2023) ("In analyzing whether an officer had reasonable suspicion, [courts] look to the totality of the circumstances.") (Citing *Kansas v. Glover*, 140 S.Ct. 1183, 1191 (2020)). "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." *United States v. Martin*, 15 F.4th 878, 882 (8th Cir. 2021) (quotation omitted); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "In short, the government must point to specific, articulable facts that reasonably suggest a crime." *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (citing *Terry*, 392 U.S. at 27).

"In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ortiz–Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (internal quotation marks and citations omitted). Even innocuous actions may give rise to reasonable suspicion under the totality of the circumstances. *United States v. Condelee,* 915 F.2d 1206, 1209 (8th Cir. 1990) (opining that "there could be 'circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot'") (quoting *Reid v. Georgia,* 448 U.S. 438, 441 (1980)). When justifying a particular stop, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v.*

*Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citations omitted). Moreover, "[t]he 'reasonable suspicion' necessary to justify [a *Terry*] stop 'is dependent upon both the content of information possessed by the police and its degree of reliability.'" *Navarette v. California*, 527 U.S. 393, 397 (2014) (quoting *White*, 496 U.S. at 330).

"Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972); *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004)). The Eighth Circuit has held that, "[t]hough less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008). In *United States v. Nolen*, 536 F.3d 834 (8th Cir. 2008), the Eighth Circuit explained these distinctions further:

> [T]he Supreme Court has recognized a distinction between "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated," *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), and an anonymous informant, who cannot so easily be held responsible. *See also United States v. Kent*, 531 F.3d 642, 649 (8th Cir.2008) (asserting that a known informant "could be held accountable by [a] detective for [providing] false information"). This distinction is important, because although a tip received from a known informant will more readily support a finding of probable cause, a tip received from an anonymous informant requires "[s]omething more," usually in terms of independent police corroboration, before probable cause may arise. [*Illinois v.*] *Gates*, 462 U.S. [213,] 227, 241. . . .
>
> In addition to there being a distinction between known informants and anonymous informants, there is also an important distinction between the two types of known informants: reliable informants and unproven informants. Reliable informants are individuals who have "a track record of supplying reliable information" to law enforcement officers. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir.1993). Information supplied by such parties may be "sufficiently reliable to support a probable cause

10

finding." *Id. See also United States v. Lucca*, 377 F.3d 927, 933 (8th Cir.2004) (asserting "[t]he information from a [confidential reliable informant] is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information."). Unproven informants are individuals without a track record of supplying information to law enforcement officers. "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *Kent*, 531 F.3d at 649. Nevertheless, information supplied by such individuals "requires some independent verification to establish reliability." *Id.* (citing *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir.1995)). "Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." *Brown*, 49 F.3d at 1349.

*Nolen*, 536 F.3d at 839-40. "A[n] . . . informant's tip may support a reasonable suspicion if it has sufficient indicia of reliability[.]" *United States v. Manes*, 603 F.3d 451, 456 (8th Cir. 2010). The following are indicators of an informant's reliability: (1) eyewitness knowledge of facts, *Navarette*, 527 U.S. at 399; (2) predictions of future behavior, *Id.* at 398; *Manes,* 603 F.3d at 456; (3) detailed descriptions of alleged wrongdoing, *Navarette,* 572 U.S. at 398; (4) a track record as a reliable source of information, *Manes,* 603 F.3d at 456; (5) independent corroboration of facts, such as identity, *Id.; Navarette,* 572 U.S. at 398; and (6) contemporaneous reporting of events, such as calling 911 immediately upon viewing criminal behavior, *Navarette*, 572 U.S. at 398-400 (internal citations omitted). *United States v. LaGrange*, No. 18-CR-90-CJW, 2018 WL 6198278, at *6 (N.D. Iowa Nov. 28, 2018).

In general, the reasonable suspicion standard "is 'less demanding' than probable cause and much lower than preponderance of the evidence." *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court explained that:

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* . . . demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S. at 147. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*White*, 496 U.S. at 330.

"There is no clear line between investigative stops and de facto arrests." *United States v. Sanford*, 813 F.3d 708, 712 (8th Cir. 2016) (citing *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013)). The Eighth Circuit explained that:

During a *Terry* stop, officers must use "the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (quoting *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)). "A *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Id*. "As part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop.'" *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (quoting *Newell*, 596 F.3d at 879). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their

12

safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). "In discerning whether [an officer's] actions [meet] the Fourth Amendment's standard of reasonableness, the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger." *Williams v. Decker*, 767 F.3d 734, 740 (8th Cir. 2014).

*Sanford*, 813 F.3d at 713.

## C. *Analysis*

Defendant and the Government frame the issues differently. First, Defendant repeatedly refers to the caller as an anonymous tipster. (Doc. 28-1 at 4-9.) The Government, on the other hand, correctly points out that, even though the caller initially sought to remain anonymous, upon speaking with Sergeant Williams, the caller "provided his name to [Sergeant] Williams, who knew the caller and knew he had a criminal history" and the caller was also knew Sergeant Williams. (Doc. 36 at 7; Williams Hr'g Test. at 5.) Therefore, because Sergeant Williams and the caller knew each other and the caller gave Sergeant Williams his name, the caller was no longer anonymous as urged by Defendant. Thus, based on the totality of the circumstances, I find that the caller was an unproven informant, i.e., in a category less reliable than an informant with a proven record, but more reliable than an anonymous tipster. *See Kent*, 531 F.3d at 649 ("Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information."). The fact that the caller initially desired to remain anonymous cannot be wholly disregarded. However, in the case at bar, the caller stuck with his story after he knew Sergeant Williams had identified him and the caller presumably knew he could be subject to criminal penalties if he provided false information. Accordingly, as with any unproven informant, "some independent verification" was necessary to establish his reliability. *Id*.

13

Second, Defendant frames all of law enforcement's actions on October 5, 2022 as conducting Defendant's arrest. (Doc. 28-1 at 3.) The Government, on the other hand, frames law enforcement's actions on October 5, 2022 as conducting a *Terry* stop which eventually led to Defendant's arrest. (Doc. 36 at 4-11.) "There is no clear line between investigative stops and de facto arrests." *Sanford*, 813 F.3d at 712. In *United States v. Fisher*, 364 F.3d 970 (8th Cir. 2004), while responding to a "flight-with-weapons" call, police officers encountered two Native American males, the defendant and a younger individual named Lorenzo. *Id*. at 972. The officers questioned the defendant and Lorenzo from their squad car:

> At the time, [the defendant] had a temporary cast and crutches, and was wearing a light brown plaid flannel shirt. During their encounter with the officers, [the defendant] and Lorenzo were cooperative and non-threatening. From their squad car, the officers questioned [the defendant] and Lorenzo to determine whether Lorenzo was a truant. Satisfied with the answers, the officers left and proceeded to their original destination.

*Id*. After approximately three blocks, an individual flagged the officers down and told them that an individual matching the defendant's description had moments earlier pointed a gun at him and thought the same individual had robbed him a few weeks earlier. *Id*. The officers left the individual to find the defendant:

> The officers did not ask the complainant's name or run a records check. They told him to stay where he was located, and then left to retrace their route looking for [the defendant].
>
> When the officers spotted [the defendant], they pointed their guns at him, ordered him to stop, and told him to raise his hands. Officer Clifford later explained that they had drawn their weapons because of concern for their safety. During this encounter, [the defendant] blurted out that he had a gun. Clifford found and removed a pistol from [the defendant's] pocket. [The defendant] was then arrested. When officer attempted to find the complainant, they could not locate him. All attempts to locate or identify him were unsuccessful.

14

*Id*. The defendant moved to suppress his statement and the gun as fruit of an illegal arrest. *Id*. Specifically, the defendant argued that his encounter with the officers was not an investigative stop but was an arrest at the moment the officers pointed their guns at him. *Id*. The defendant also argued that the arrest was illegal because the officers lacked probable cause. *Id*. The Eighth Circuit held that, "[b]ecause we conclude that the stop was supported by a reasonable, articulable suspicion, and that the degree of force used by the officers did not transform the encounter from and investigative stop to an arrest, we reject [the defendant's] contention." *Id*. at 972-73. The Eighth Circuit reasoned that:

> An investigative stop must be limited in scope and manner to satisfy the requirements of *Terry*. There is "no 'litmus-paper test' or 'sentence or paragraph' rule to determine when, given the 'endless variations in facts and circumstances,' police-citizen encounters exceed the bounds of mere investigative stops." *United States v. Jones,* 759 F.2d 633, 636 (8th Cir.1985) (quoting *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)). It is well established, however, that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety. *See United States v. Navarrete–Barron,* 192 F.3d 786, 789–91 (8th Cir.1999) (officers did not exceed limits of *Terry* stop by drawing weapons and handcuffing drug trafficking suspect who may have been armed); *United States v. Lloyd,* 36 F.3d 761, 762–63 (8th Cir.1994) (brandishing gun and ordering suspect to raise hands did not transform *Terry* stop to an arrest where police were looking for men who had just threatened complainant with firearms); *United States v. Danielson,* 728 F.2d 1143, 1146–47 (8th Cir.1984) (officers did not exceed bounds of investigative detention by approaching suspects in armed bank robbery with weapons drawn).

> The decision to approach [the defendant] with guns drawn was reasonably necessary to the investigative stop. Although [the defendant] had been cooperative in his initial encounter with the officers, this cooperation did not negate the risk that [the defendant] was armed and potentially

> dangerous. After their first contact with [the defendant], the officers
> received specific information that an assailant matching [the defendant's]
> description had used a gun in connection with an assault only minutes
> earlier. Moreover, the officers were approaching [the defendant] in a
> neighborhood known for gun violence. Under these circumstances, the
> officers were entitled to exercise a great degree of control over the
> investigative stop.

*Id*. at 973-74.

Similarly, in *United States v. Navarrete-Barron*, 192 F.3d 786 (8th Cir. 1999),
police officers arrested an individual, Jaime Garcia, for driving under the influence. *Id*.
at 789. Officers searched Garcia's vehicle and found 14 ounces of crack cocaine, $37,000
in cash, ammunition for a handgun, and a room key for a local motel. *Id*. Garcia told
the officers that the vehicle belonged to his friend, the defendant, with whom he was
staying at the motel. *Id*. Officers immediately began surveillance on the motel room and
observed the defendant in the room. *Id*. Officers observed a pickup truck arrive at the
motel, the driver of the truck entered the defendant's room and made a quick phone call.
*Id*. The defendant and the driver exited the room with a duffel bag and drove off in the
truck. *Id*. About one-half mile later, two officers stopped the truck. *Id*. "The officers
drew their guns and ordered the driver and passenger [(the defendant)] to exit the truck
with their hands in the air." *Id*. Both the driver and the defendant were handcuffed and
placed in separate squad cars. *Id*. Based on the foregoing facts, the Eighth Circuit
determined that:

> the officers made a valid *Terry* stop of the truck and later had probable
> cause to arrest [the defendant]. First, the initial stop was supported by
> reasonable and articulable suspicion of criminal activity. Earlier that
> morning, officers had discovered a large amount of cocaine base along with
> $37,000 and firearm ammunition. This discovery provided direct and
> substantial evidence of Garcia's involvement in drug trafficking activity.
> Garcia's statements to the police about [the defendant] back at the motel
> who had recently purchased the vehicle coupled with a key to the motel

16

room provided enough evidence to support and inference that others were engaged in drug trafficking. Police officers later corroborated Garcia's statements during their surveillance of the motel room. In sum, the officers had a reasonable and articulable suspicion sufficient to make a valid *Terry* stop of the truck in which [the defendant] was a passenger.

*Id*. at 790-91. The Eighth Circuit also determined that the officers "did not use unreasonable force when they approached the truck with their weapons drawn" because, "[a]t the time of the stop, the officer had a reasonable suspicion that the occupants of the truck had been or were engaged in drug trafficking, which very often is accompanied by dangerous weapons" and having their guns drawn while approaching the truck was "reasonably necessary for their protection." *Id*. at 791. As for handcuffing the defendant and the driver and placing them in separate squad cars, the Eighth Circuit found that, "[i]n light of the dangerous nature of the suspected crime of drug trafficking and the good possibility that the driver or passenger had a weapon, the defendant's confinement with handcuffs in the back of a police car during the search of the truck was reasonably necessary to maintain the status quo, protect the officers, and allow them to conduct the search of the truck immediately and without interference." *Id*.

Like in *Fisher* and *Navarrete-Barron*, I find that the officers' actions in this case constituted an investigatory *Terry* stop on Defendant, which ultimately resulted in Defendant's arrest. Here, approximately three hours before officers stopped Defendant, law enforcement received information that Defendant was traveling from Chicago to Dubuque and was transporting guns and drugs. The information provided to law enforcement included the bus Defendant was traveling on from Chicago to Dubuque, which provided law enforcement with the approximate time Defendant would be arriving in Dubuque. The information given to law enforcement also provided Defendant's description and the location Defendant would be going once he arrived in Dubuque. Law enforcement corroborated the information and came up with a plan to approach Defendant

and take him into custody. (Williams Hr'g Test. at 3-10; Gov. Exhibit 1 at 4.) Law enforcement set up surveillance at the bus station, identified Defendant after he exited the bus and began walking northbound to East 22nd Street. Officers approached Defendant with guns drawn, took Defendant to the ground and handcuffed him, and had a short conversation with Defendant before he admitted having a firearm on his person. (Williams Hr'g Test. at 10-14.) Based on the foregoing, I find that law enforcement's initial contact with Defendant constituted a *Terry* stop consistent with *Fisher* and *Navarrete-Barron*. The intentions of law enforcement—whether to merely make a *Terry* stop and investigate or to arrest Defendant because law enforcement thought they had probable cause—are unclear on the record before me. Nevertheless, I find that regardless of the officers' subjective intent, the officers did no more than conduct a lawful *Terry* stop before finding evidence of Defendant's possession of a firearm which gave the officers probable cause to arrest him.

Having determined that this case involves an unproven informant and a *Terry* stop, I will address whether the officers had reasonable suspicion to conduct the investigatory *Terry* stop. Here, the caller eventually acknowledged his identity to Sergeant Williams and it appeared they were familiar with each other. (Williams Hr'g Test. at 4-5.) The caller told Sergeant Williams that he had known Defendant for a long time and that they were like brothers. (*Id.* at 6.) The caller knew where Defendant lived in Dubuque and stated that Defendant used PCP. (*Id.*) The caller told Sergeant Williams that Defendant was on a 10:30 a.m. Trailways bus from Chicago to Dubuque, that Defendant was transporting guns and drugs, and would take an Uber to his Dubuque residence along with the guns and drugs. (*Id.*) The caller also gave an accurate description of Defendant and told Sergeant Williams that the information he was relaying came directly from Defendant. (*Id.* at 9.)

Upon receiving the foregoing information, Sergeant Williams took steps to verify the information. First, Sergeant Williams contacted the Dubuque Trailways bus office. The Trailways agent informed Sergeant Williams that Defendant had purchased a ticket for the bus that was set to arrive in Dubuque from Chicago between 11:00 a.m. and 11:45 a.m. However, the Trailways agent could not say whether Defendant had actually boarded the bus in Chicago. (*Id.* at 8.) Sergeant Williams also checked law enforcement records and found that Defendant lived at the Dubuque residence identified by the informant. Sergeant Williams noted that within a month prior to the present incident involving Defendant, an ambulance had been dispatched to Defendant's Dubuque residence and based on Defendant's interactions with the ambulance personnel, they believed that Defendant was under the influence of PCP. (*Id.*) Sergeant Williams also ran a criminal history check on Defendant. Sergeant Williams confirmed that Defendant was a convicted felon and had had convictions for being a felon in possession of a firearm and armed robbery with a firearm. Sergeant Williams also noted convictions for domestic assaults and drug offenses. (*Id.* at 9.)

In considering the *Navarette* and *Manes* factors for determining an informant's reliability, I find that the caller's information in this case was sufficiently reliable. First, while the caller's information was not based on eyewitness knowledge, it was based on direct information from Defendant. *See Navarette*, 527 U.S. at 399. Second, the caller gave accurate information regarding the bus that Defendant was traveling on from Chicago to Dubuque and the approximate time it would arrive in Dubuque. The caller also provided Defendant's correct address in Dubuque and provided an accurate description of Defendant. Even though he did not use an Uber before he was stopped, when Defendant left the bus station, he was walking in the direction of his Dubuque residence. *See id.* at 398; *Manes,* 603 F.3d at 456. Third, the caller stated that Defendant was transporting guns and drugs and law enforcement corroborated that Defendant had a

history of gun and drug offenses. *See Navarette,* 572 U.S. at 398. Fourth, while the caller did not have a track record of providing reliable information, he was not an anonymous tipster and therefore had a greater level of reliability than an anonymous tipster. *See Manes,* 603 F.3d at 456; *see also Kent,* 531 F.3d at 649 ("Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information."). Law enforcement independently corroborated much of the information provided by the caller. Law enforcement identified Defendant, reviewed his criminal history, confirmed that Defendant had purchased a ticket for the bus traveling from Chicago to Dubuque on October 5, 2022 and arriving at approximately 11:00 a.m. to 11:45 a.m. Law enforcement also confirmed Defendant's Dubuque address. Records also showed that recent emergency personnel had responded to Defendant's Dubuque residence and emergency personnel believed that Defendant had been using PCP. *See Manes,* 603 F.3d at 456*; Navarette,* 572 U.S. at 398. Sixth, the caller relayed the information to law enforcement about three hours prior to Defendant's stop and arrest, which is consistent with the bus travel time between Chicago and Dubuque. *See Navarette,* 572 U.S. at 398-400.

Based on the foregoing, I find that the information provided by the caller had sufficient indicia of reliability, and was sufficiently corroborated by law enforcement. *See Bell,* 480 F.3d at 863; *Manes,* 603 F.3d at 456. To the extent Defendant relies on *Florida v. J.L.,* 529 U.S. 266 (2000) for the proposition that law enforcement failed to adequately corroborate the information provided by the caller, Defendant's reliance on *J.L.* is misplaced. Significantly, *J.L.* involved an anonymous tipster, not a known, albeit unproven, informant. Moreover, unlike *J.L.,* where the Supreme Court found that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for

believing he had inside information about J.L.," 529 U.S. at 271, here the caller was a close friend of Defendant who was relaying information that he learned directly from Defendant involving specific facts such as the bus Defendant was traveling on from Chicago and its approximate arrival time in Dubuque, Defendant's Dubuque address, and Defendant's description. As discussed above, law enforcement was able to accurately corroborate a great deal of this information. Accordingly, I find that the reliability of the caller's information and corroboration by law enforcement is consistent with *Navarette* and *Manes* and supported law enforcement's reasonable suspicion to conduct a valid *Terry* stop on Defendant. *See Bell*, 480 F.3d at 863 ("Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated.") (Citing *Adams*, 407 U.S. at 147; *Jacobsen*, 391 F.3d at 906).

Defendant raises questions principally about the caller's motive, i.e., the caller's desire to remain anonymous and the caller's purported desire to help Defendant by assisting in his arrest. In assessing an informant's motives, the United States Supreme Court has stated, "even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." *Illinois v. Gates*, 462 U.S. 213, 234 (1983). "When an informant's information is at least partly corroborated . . . 'attacks upon credibility and reliability are not crucial to the finding of probable cause.'" *United States v. Gladney*, 48 F.3d 309, 313 (8th Cir.1995) (quoting *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir.1992)). Here, the information was sufficiently corroborated to justify a *Terry* stop, despite any questions that might have arisen regarding the caller's motive in reporting Defendant to law enforcement.

As discussed above, law enforcement officers conducting the *Terry* stop with their firearms drawn did not constitute unreasonable force because at the time of the stop the

officers had reasonable suspicion that Defendant was armed and having their guns drawn was reasonably necessary for their protection. *See Navarrete-Barron*, 192 F.3d at 791. Handcuffing Defendant was also reasonably necessary based on the dangerous nature of the suspected crime of a felon in possession of a firearm and the necessity to maintain the status quo, protect the officers, and allow them to pat down the Defendant for weapons. *See id*. Furthermore, the *Terry* stop lasted approximately three minutes. After going to the ground and being handcuffed, Defendant was read his *Miranda* rights and asked whether he had any weapons on his person. Defendant initially said no, but when told that he would be patted down, he stated that he had a firearm on him. He acknowledged that he was a convicted felon. Defendant stated the firearm was on his right side in his belt/waistband. Law enforcement recovered a 9mm Taurus handgun from Defendant's person. (Williams Hr'g Test. at 14-15; Gov. Exhibit 2 at 1:32-4:30.) Upon admitting that he possessed a firearm, law enforcement had probable cause to arrest Defendant for being a felon in possession of a firearm and to search his person to retrieve the firearm.

Accordingly, based on the totality of the circumstances, I find that the law enforcement officers had reasonable suspicion to conduct a *Terry* stop and recommend that Defendant's motion be denied.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 28.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the

district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

   **DONE AND ENTERED** at Cedar Rapids, Iowa, this 15th day of May, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa