**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-CR-1001 CJW-MAR |
| Plaintiff, | **ORDER** |
| vs. | |
| TONY WALKER, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................. 2

II.  STANDARD OF REVIEW............................................................... 2

III.  FACTUAL BACKGROUND ............................................................ 3

IV.  ANALYSIS...................................................................................... 8

    A.  Seizure of Defendant ............................................................. 9

    B.  Use of Force ........................................................................16

    C.  Handcuffing Defendant.........................................................17

    D.  Evaluation of the Informant Tip .................................................17

    E.  The Appropriate Standard ......................................................23

    F.  Reliance on *Navarette* and *Manes* ............................................25

V.  CONCLUSION...............................................................................25

1

# I.  INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress, in which defendant requested a hearing.  (Doc. 28).  The government timely filed a resistance.  (Doc. 36).  The Court referred defendant's motion to the Honorable Mark A. Roberts, United States Magistrate Judge, for Report and Recommendation ("R&R").  On April 18, 2023, Judge Roberts held a hearing on the motion.  (Doc. 37).  On May 15, 2023, Judge Roberts recommended that the Court deny defendant's motion to suppress.  (Doc. 38).  Defendant objected to Judge Roberts' R&R.  (Doc. 42).  For the following reasons, the Court **sustains in part and overrules in part** defendant's objections, **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

# II.  STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party

2

files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

## III. FACTUAL BACKGROUND[1]

On October 5, 2022, the Dubuque County, Iowa law enforcement dispatcher service (sometimes "dispatch") informed Sergeant Adam Williams that it had received an anonymous call with information that an individual would be arriving in Dubuque, Iowa, by bus transporting guns and drugs.[2] (Williams Hr'g Test. at 3). Specifically, the anonymous caller told the dispatcher that defendant would be on the 10:30 a.m. bus from Chicago, Illinois to Dubuque. The caller stated that defendant would be transporting guns and drugs. According to the caller, when defendant arrived in Dubuque, he would take an Uber from the bus station to a residence on East 22nd Street. (*Id*. at 4). While the caller did not reveal his name to the dispatcher, the dispatcher had access to the caller's telephone number, which was also relayed to Sergeant Williams.

Sergeant Williams was able to identify the caller through law enforcement records showing the caller's telephone number. Sergeant Williams phoned the caller to speak with him and receive firsthand the information previously provided to the dispatcher. (*Id*.). Sergeant Williams recognized the caller's name and was familiar with the caller

---

[1] After reviewing the hearing transcript (Doc. 39), the Court finds that Judge Roberts accurately and thoroughly set forth the relevant facts in the R&R. The Court adopts Judge Roberts' summary of the facts here, including footnotes. When relevant, the Court relies on and discusses additional facts in conjunction with its legal analysis.

[2] Sergeant Williams is employed by the Dubuque County Sheriff's Office. He is currently assigned to the Drug Task Force and has been its director for a little over one year. He has been in law enforcement since 2006 and is a graduate of the Iowa Law Enforcement Academy.

Case 2:23-cr-01001-CJW-MAR   Document 48   Filed 06/26/23   Page 3 of 25

based on personal interaction with the caller and the caller's criminal history, which included drug possession, domestic assaults, firearms offenses, and a current investigation involving human trafficking. (*Id.* at 5, 16). When he spoke with the caller, Sergeant Williams testified that he recognized the caller's voice based on prior interactions with the caller. The caller also recognized Sergeant Williams. They had a short back-and-forth conversation that confirmed that they knew each other. (*Id.* at 5).

The caller relayed nearly identical information to Sergeant Williams as he had earlier reported to the dispatcher. Specifically, the caller told Sergeant Williams that the caller had known defendant for a long time and considered him to be like a brother. The caller knew defendant's residence and provided its address on East 22nd Street in Dubuque. The caller stated that defendant had a drug problem and used PCP. The caller indicated that he had tried several times to get defendant to change his ways and stop using drugs, but his attempts had failed, and he believed that the only way for defendant to change was for him to be arrested. The caller also told Sergeant Williams that defendant would be arriving in Dubuque on the 10:30 a.m. Trailways bus and defendant would be transporting guns and drugs.[3] According to the caller, once defendant arrived in Dubuque, he would take an Uber to his residence along with the guns and drugs. The caller also gave Sergeant Williams a description of defendant.[4]

---

[3] Sergeant Williams noted that if the Trailways bus travels directly from Chicago to Dubuque, it generally arrives at 10:30 a.m. However, if the bus makes a stop in Davenport, Iowa, before Dubuque, it generally arrives later than 10:30 a.m. Here, the bus arrived in Dubuque later than 10:30 a.m. because it first stopped in Davenport. (Williams Hr'g Test. at 7).

[4] The caller gave the following description of Defendant to Sergeant Williams: Approximately six-foot tall, black male with dark skin. (Williams Hr'g Test. at 7). This is not a particularly detailed description, but it is not inaccurate.

4

(*Id.* at 6-7).   Additionally, the caller told Sergeant Williams that he knew defendant would be on the bus with guns and drugs because he learned this information directly from defendant.[5]   (*Id.* at 9).

   After speaking with the caller, Sergeant Williams attempted to verify the information that the caller provided.   First, Sergeant Williams called the Trailways bus office in Dubuque and inquired whether defendant was on the October 5, 2022 Trailways bus from Chicago to Dubuque.   The Trailways agent told Sergeant Williams that defendant had purchased a ticket from Chicago to Dubuque and was scheduled to arrive between 11:00 a.m. and 11:45 a.m. on October 5, 2022.   However, the Trailways agent stated that he could not verify that defendant actually boarded the bus.   Sergeant Williams also verified defendant's residence through law enforcement records.   Specifically, Sergeant Williams learned that there had been more than one incident involving defendant at the address the caller gave as defendant's residence.   (*Id.* at 8).   One of the incidents involved an ambulance call to the residence.   According to the dispatch notes, the ambulance personnel believed defendant was under the influence of PCP.   (*Id.* at 8, 16-18).   Further, Sergeant Williams ran defendant's criminal history, which included convictions for being a felon in possession of a firearm, armed robbery, domestic assault, drug offenses, and being an armed habitual criminal. Defendant also had a non-extraditable warrant from Indiana which would not provide a basis for police to arrest him in Dubuque.   (*Id.* at 9, 52-53).   A summary of the factual information and the status of verification at the time of the stop may be helpful.

---

[5] Sergeant Williams testified that "[t]he caller heard the information directly from Mr. Walker." (Williams Hr'g Test. at 10).   As discussed below, the means of communication between Defendant and the caller was not established.   To the extent this constitutes a discrepancy, I find it minor and ultimately inconsequential.   In everyday communication, people may say they have "heard" from someone by phone, text, email, or other forms of correspondence.

| Information Supplied by Caller | Verification by Law Enforcement |
|---|---|
| Tony Walker is on a Trailways bus from Chicago to Dubuque | Sgt. Williams verified a ticket was purchased by defendant. His presence on the bus was verified before defendant was seized. |
| Bus to arrive at 10:30 a.m. in Dubuque | The expected time was accurate, but a stop in Davenport delayed it. |
| Carrying guns and drugs | Not verified. Obtaining this information was, of course, the purpose of the stop and defendant's possession of a firearm came after the stop. However, law enforcement did verify prior convictions that would make it illegal for defendant to possess a firearm. |
| Taking an Uber to his residence | Not verified. Defendant was, however, walking in the direction of the reported residence. |
| Residence at specific address in Dubuque | An ambulance was called to the specific address where defendant was encountered in the prior month. |
| Defendant's description | The description matched pictures obtained by law enforcement. |
| Known Defendant for a long time, like a brother | Not verified. |
| Needs to be arrested | This subjective assessment was not verified but is discussed below in more detail. |
| Defendant has a PCP problem | The above-referenced ambulance call was related to defendant's suspected PCP use. |

As defendant's counsel pointed out during cross-examination, there were aspects of the caller's report that were not verified, or could not be verified, which may have cast some suspicion on the veracity of the report. For example, the caller had a long and troubling criminal history (*see* Def. Exhibits D-1 to D-11) and was the subject of an on-going human trafficking investigation. Sergeant Williams knew something of the caller's criminal history but chose not to run it, even though he could have done so in about 15 minutes. The caller did not know the number or types of guns, or the types of drugs defendant was believed to be carrying.

Defendant also pointed out certain limitations on the facts Sergeant Williams considered to have been verified. For example, the reported PCP use by defendant was from a dispatcher's note of what was suspected by ambulance personnel. Sergeant Williams did not determine when the caller learned the information (so he could not

determine if it was dated), how the information was communicated, or obtain defendant's phone number from the caller.

Defendant also pointed out reasons to be suspicious of the caller's motives. For example, the caller's desire to remain anonymous, if ultimately futile, might be indicative of his desire to hide something. The caller reported that defendant had shared information about his criminal activity (i.e., transporting guns and drugs). Defense counsel found it suspicious defendant would have shared this information with the caller unless the caller was also involved in criminal activity. Similarly, the caller did not report how he knew defendant was using PCP and the caller might have been involved in the use of illegal drugs—a possibility Sergeant Williams did not address with the caller.

Additionally, defendant noted that assisting to arrange his arrest is a fairly drastic way for the caller to obtain help for him. Sergeant Williams had no information about what other steps the caller had pursued to help defendant, if any. The caller's motive, defense counsel pointed out, might also seem suspect in light of the absence of recent convictions on defendant's record. In other words, if such dire measures were necessary to obtain help for defendant, one might expect more recent convictions.

After verifying the information provided by the caller, to the extent described above, Sergeant Williams held a briefing to discuss how law enforcement would "approach and eventually take [defendant] into custody." (*Id.* at 10). Sergeant Williams enlisted the help of other law enforcement agencies and departments to assist with setting up a perimeter around the bus station. Sergeant Williams and two other officers established surveillance at the bus station and waited for the bus to arrive. Approximately eight additional officers set up a three-block radius perimeter around the bus station. (*Id.* at 10).

When the bus arrived, two individuals exited the bus. One of those individuals matched defendant's description and was carrying a backpack. After exiting the bus, the

individual tentatively identified as defendant immediately started walking northbound toward East 22nd Street.   Defendant was continuously observed from the time he left the bus and had no opportunity to dispose of anything.   Sergeant Williams, along with two other officers, drove directly past the individual and all agreed that the individual was defendant and the person identified by the caller.[6]   The officers drove one block in front of defendant and intended to approach him from that point.   As defendant approached the intersection at Elm Street and 13th Street, the officers ran up to defendant, with their firearms drawn.   The officers were wearing clothing identifying them as members of law enforcement.   Sergeant Williams directed defendant to the ground. Sergeant Williams grabbed Defendant's left wrist as he was going to the ground and another investigator took defendant's right wrist.   Defendant's arms were placed behind his back and he was handcuffed.

Sergeant Williams advised defendant of his *Miranda* rights and then asked defendant whether he had any weapons on him.   Initially, defendant denied having any weapons.   After being told that he would be patted down, defendant stated that he had a weapon on his person.   Defendant told the officers that the weapon was on his right side in his belt/waistband.   The officers located a 9mm Taurus handgun.   (*Id*. at 10-15).

## IV.   ANALYSIS

In his objections to Judge Roberts' R&R, defendant argues Judge Roberts erred in (1) characterizing the seizure of defendant as a *Terry* stop and not a de facto arrest; (2) categorizing the force used against defendant as reasonable; (3) finding handcuffing defendant was reasonably necessary; (4) reasoning that the caller's tip should not be evaluated under the same scrutiny as an anonymous caller; (5) finding the requisite

---

[6] Sergeant Williams testified that, after speaking with the caller and prior to setting up surveillance at the bus station, he obtained four pictures of defendant including pictures from the prison system and Defendant's driver's license.   These pictures aided the officers in identifying Defendant outside the bus station.   (Williams Hr'g Test. at 15).

Case 2:23-cr-01001-CJW-MAR   Document 48   Filed 06/26/23   Page 8 of 25

quantum of suspicion was met, because the applicable standard was probable cause, and; (6) relying on analysis in *Navarette v. California*, 572 U.S. 393 (2014), and *United States v. Manes*, 603 F.3d 451 (8th Cir. 2010), because those cases analyze reasonable suspicion, not probable cause. (Doc. 42, at 1-6). Defendant also asserts that Judge Roberts did not recite the full extent of Sergeant Williams' knowledge of the caller's criminal history. (*Id.*, at 6-7).

### A.     Seizure of Defendant

For the following reasons, the Court finds officers' seizure of defendant was a *Terry* stop, not a de facto arrest.

"Whenever practicable," officers must obtain a warrant to effectuate a search or seizure of a person. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). A "seizure" occurs whenever police officer accosts individual and restrains his freedom to walk away, and a "search" occurs whenever an officer makes careful exploration of outer surfaces of person's clothing in attempt to find weapon. *Id.*, at 16-17. But as the Supreme Court articulated in *Terry*, a certain type of search and seizure does not require probable cause. An officer may undertake a "reasonable search for weapons for the protection of the police officer," when the officer has reason to believe the person is armed and dangerous, even if the officer lacks probable cause to arrest that person. *Id.*, at 27. This narrowly defined search has come to be known as a "*Terry* stop."

"[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). Whether the search is lawful depends on the totality of the circumstances. *See United States v. Stewart*, 631 F.3d 453, 456 (8th Cir. 2011); *United States v. Cortez*, 449 U.S. 411, 417 (1981). When making a *Terry* stop, officers must use "the least intrusive means of detention and investigation, in terms of scope and

9

duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir. 1999). *See also United States v. Redman*, 39 F.4th 1030, 1033 (8th Cir. 2022). Officers may take whatever measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235. *See also Redman*, 39 F.4th at 1033. But "[a] *Terry* stop may become an arrest, requiring probable cause, 'if the stop lasts for an unreasonably long time or if officers use unreasonable force.'" *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (quoting *Navarrete-Barron*, 192 F.3d at 790).

"Factors to consider in determining the reasonableness of the officers' actions include (1) the number of officers and police cars involved;[7] (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances." *United States v. Raino*, 980 F.2d 1148, 1149-50 (8th Cir. 1992). Other factors include "[6] the duration of a stop, [7] whether the suspect was handcuffed or confined in a police car, [8] whether the suspect was transported or isolated, and [9] the degree of fear and humiliation that the police conduct engenders." *United States v. Hill*, 91 F.3d 1064, 1070 (8th Cir. 1996) (cleaned up). *See also Pollreis v. Marzolf*, 9 F.4th 737, 746 (8th Cir. 2021) (discussing duration); *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457-58 (8th Cir. 2011) (discussing handcuffing); *United States v. Lego*, 855 F.2d 542, 544-45 (8th Cir. 1988) (discussing fear and humiliation).

---

[7] Implicit in the assessment of the number of officers and vehicles is the ratio of officers to suspects. *See United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992) (finding seizure was a *Terry* stop when suspects were handcuffed and there were six suspects and three officers, and two officers needed to leave to investigate).

Courts also often consider (10) whether officers told the suspects they were not under arrest, *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (finding that such a notification weighs against a finding of de facto arrest), and (11) whether the suspects were compliant with officers, *Pollreis*, 9 F.4th at 746. Additionally, courts consider (12) whether officers drew their weapons when engaging with the suspects. *United States v. Jones*, 759 F.2d 633, 638-39 (8th Cir. 1985). Implicit in the assessment of drawn weapons is that weapons were drawn at an appropriate time—that is, before the situation was under control. *Pollreis*, 9 F. 4th at 748.

The Court will consider these twelve factors in its analysis of whether the seizure of defendant was a de facto arrest. These factors, however, are not exhaustive. Thus, the Court will analyze the totality of the circumstances presented here. *See Terry*, 392 U.S. at 30 ("Each case of this sort will, of course, have to be decided on its own facts.").

Here, the Court finds the seizure of defendant was not a de facto arrest given the totality of the circumstances. Several factors weigh in favor of finding a *Terry* stop. First, the nature of the crime alleged was dangerous. Officers had been informed that defendant was illegally armed and bringing both guns and drugs from Chicago to Dubuque. Accordingly, officers had reason to suspect that defendant possessed firearms and could use them on the officers. Though there was no evidence defendant threatened anyone with a gun or had specific plans to use one, Sergeant Williams knew defendant had a criminal history including violence and possession of a firearm despite being a felon. This information tends to support that defendant would use a gun in his possession. The informant's tip also stated defendant was bringing both guns and drugs. Guns and drugs are often possessed together in the context of drug trafficking. Given the violence associated with drug trafficking, this combination would reasonably cause officers to view any seizure of defendant as potentially posing a serious danger. *Cf. United States*

11

*v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). Thus, it was reasonable for officers to respond with a greater force than might otherwise have been necessary.

Second, in light of the tip asserting that defendant possessed guns and drugs and the stop occurring in a public space, officers had a need for immediate action and lacked an opportunity to stop defendant in less threatening circumstances than drawing weapons and ordering defendant to the ground. It is possible that officers could have waited to arrest defendant at his house or other destination, but officers did wait until defendant had walked some distance from the bus station and, viewing the body camera video, there were no other people around when they stopped him. Defendant argues that because there were no members of the public in the vicinity, officers need not have used the force they did. But the officers were making decisions in the moment. Though officers waited for defendant to leave the bus station, the station was still only a short distance away and the seizure occurred in downtown Dubuque. Accordingly, people could have entered the scene and been harmed by potential gunfire, even if no members of the public were visible in the body camera footage.

Third, although some officers had their guns drawn when seizing defendant, there was a clear possibility that defendant was armed given that the informant told Sergeant Williams defendant was bringing guns to Dubuque. Further, the officers had their weapons drawn only before the situation was under control.

Fourth, officers did not transport or otherwise isolate defendant. The entire seizure took place in a single location.

Fifth, the seizure lasted only three minutes, because after defendant admitted to being a felon in possession of a handgun, officers had probable cause to arrest him.

Sixth, Sergeant Williams told defendant he was not under arrest.[8] Defendant asked if he was under arrest and Sergeant Williams immediately responded that he was not.

Seventh, Sergeant Williams substantially investigated the facts of the informant's tip before stopping defendant. For instance, in so far as was possible, Sergeant Williams corroborated that defendant was on the bus the informant claimed he was, corroborated the informant's description of defendant's physical appearance with photos from his state identification and booking information, and corroborated that defendant had been involved in an incident at the residential address the informant gave as defendant's home and final destination. Sergeant Williams did not corroborate defendant's relationship with informant, but it is unclear how Sergeant Williams could do this. Anyone to whom the informant would refer Sergeant Williams would most likely contact defendant. And Sergeant Williams could not contact defendant or otherwise risk tipping him off. This is especially so given the short amount of time between defendant leaving Chicago and arriving in Dubuque. A similar quandary existed regarding corroborating whether defendant possessed guns and drugs—and similar circumstances mitigate concerns that Sergeant Williams did not attempt to corroborate that specific information, either.

Other factors are in equipose. First, the strength of the officers' articulable, objective suspicions was not particularly strong, and not particularly weak. Officers acted based on the informant's tip and while Sergeant Williams corroborated some of that information,[9] he did not have any other information supporting that defendant was bringing guns and drugs to Dubuque.

---

[8] This was mitigated by Sergeant Williams reading defendant his *Miranda* rights, which the Court will discuss later.

[9] The Court will engage in a thorough analysis of the informant's tip and the reasonability of the officers' reliance on it when addressing defendant's objection on that specific issue.

13

Second, it is unclear whether officers reasonably needed to handcuff defendant. The officers handcuffed defendant ostensibly because he posed a threat to them, given that he possibly possessed multiple guns. But the circumstances suggest officers had control over defendant without the use of handcuffs. Three and then four armed officers were directly next to defendant, while another eight officers were within a few blocks. Two officers held defendant's arms down before handcuffing him. Defendant did not resist. Defendant also did not reach for his gun, backpack, or anything else.[10] Given defendant's compliance and the amount of armed officers present, in hindsight handcuffing defendant may not have been necessary. Nevertheless, because the relevant events took place within just a few minutes, the officers did not handcuff defendant for long.

To be sure, some factors weigh in favor of a finding of de facto arrest. First, the ratio of officers indicates many officers were present. Sergeant Williams testified that two officers—himself included—drew their weapons as they quickly approached defendant and told him to get to the ground. Another officer was also present at this time, though Sergeant Williams did not believe that officer's weapon was drawn. A fourth officer, running in from the train station, quickly joined the first three around the time defendant was restrained. Several other officers, who had been positioned in a three-block radius, came soon after. The informant stated defendant would be bringing guns. But the informant did not assert, for instance, that defendant would be bringing high-powered automatic weapons or that he was eager to engage in gunfire, which might necessitate more officers close to where defendant would be stopped. Still, the amount of officers present for defendant's actual stop was three or four officers—a fraction of

---

[10] The utility of handcuffing defendant is questionable, given that officers could not search defendant's backpack without ultimately removing his handcuffs. This, however, occurred after defendant admitted to being a felon prohibited from possessing a firearm and possessing a firearm anyway.

the total in the area. Accordingly, the ratio of officers to defendant is not as stark as it might seem initially.

Second, defendant did not make any furtive movements or engage in any erratic behavior while getting off the bus and walking down the road. *Cf. Lego*, 855 F.2d at 545 (finding no de facto arrest occurred when defendant reached into the truck cab and then advanced on an officer with his hands in his pockets). Instead, officers' belief that defendant was armed was based solely on the informant's tip and their corroboration thereof.

Third, defendant was compliant with officers' commands. The body camera video shows defendant following officers' orders. Also, at the hearing, Sergeant Williams testified that defendant was compliant and that his initial pivot when approached by officers seemed attributable to shock, not failure to cooperate.

Fourth, defendant did suffer fear and humiliation engendered by the officers' seizure of him. As defendant was walking in a public place, he encountered three officers with two guns pointed at him. He was told to get on the ground in downtown Dubuque, where people could have seen him—though it appears no one was around. His arms were splayed and pinned down by separate officers. As Sergeant Williams testified, defendant was shocked at the encounter.

Still, as concerning as defendant's fear and humiliation might be, the Court notes that it took place for less than three minutes. The parties do not dispute that once defendant admitted to committing a federal crime—that is, possession of a firearm by a felon—the officers had probable cause to arrest him and thus usurped the issue of whether the initial stop was a *Terry* stop or a de facto arrest. *Hill*, 91 F.3d at 1070. Given the short time frame, defendant did not suffer a substantial degree of fear and humiliation. And because courts assess this factor based on the degree of fear and humiliation suffered, the weight of this factor is not great here.

Fifth, though Sergeant Williams told defendant he was not under arrest, Sergeant Williams also read defendant his *Miranda* rights. At the hearing, Sergeant Williams testified that this was out of an abundance of caution for defendant's rights. The Court has no reason to doubt this testimony, but the officer's state of mind is not important; it's defendant's. A person in defendant's position would likely associate being read his *Miranda* rights with being under arrest. This is particularly the case where, as here, a defendant has a criminal history and therefore has been read his *Miranda* rights before, or, as here, a defendant has a warrant out for his arrest.[11]

In sum, several circumstances weigh in favor of finding the seizure of defendant was a de facto arrest. Nevertheless, the Court finds these circumstances do not outweigh the circumstances that weigh against such a finding. Thus, the Court finds the seizure of defendant was a *Terry* stop and not a de facto arrest.

Nevertheless, the Court pauses to note that it is difficult to imagine what additional force might be used here without resulting in a de facto arrest. Given the officers' reasonable belief that defendant possessed firearms, defendant's history of violence, and the public nature of the arrest, among other circumstances, and given the fact that the scope and duration of the detention were minimal, the Court finds the officers used the least intrusive means of detention to protect the officers' and the public's safety and to maintain the status quo. But this finding is a very close call. Indeed, the Court views the officers' use of force here as the outer boundary of reasonable force under the circumstances under *Terry*.

**B.**     ***Use of Force***

For the reasons discussed in the preceding section, the Court finds the force used against defendant was reasonable. Thus, defendant's objection is overruled.

---

[11] The Court notes that the warrant here was from out of state and was non-extraditable.

### C.    Handcuffing Defendant

The Court finds handcuffing defendant was reasonably necessary. Officers were acting based on a tip that defendant had both guns and drugs. *See El-Ghazzawy*, 636 F.3d at 457 ("[T]o use handcuffs during an investigative stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose.") (cleaned up). Sergeant Williams reviewed defendant's criminal history and knew he had previously been convicted of crimes of violence and for possessing a firearm despite being a prohibited person. Because officers stopped defendant after he got off the bus, the seizure took place in a public place. Given these facts and other circumstances discussed, handcuffing defendant was not unreasonable even though there were three to four officers present during the seizure of a single suspect. Accordingly, it was reasonably necessary that officers handcuff defendant to prevent him from accessing any firearms he possessed. Thus, defendant's objection is overruled.

### D.    Evaluation of the Informant Tip

Defendant objects to Judge Roberts' reasoning that because the informant did not recant his information when Sergeant Williams identified him and thus the informant presumably knew he would be subject to criminal penalties for providing false information, the informant should be evaluated as a known informant. (Doc. 42, at 5).

Viewing defendant's objection broadly, the Court interprets defendant's objection as objecting to Judge Roberts' findings that the informant should be evaluated with the scrutiny of a known and unproven informant, and that the informant's tip was reliable.[12] The Court finds the informant's tip should be evaluated with the scrutiny of a known and

---

[12] Accordingly, the Court responds to arguments from defendant's motion to suppress as incorporated in defendant's objections. (Doc. 42, at 1).

unproven informant—not an anonymous caller. The Court also finds, as Judge Roberts did, that the informant's tip was sufficiently reliable.

Though the informant attempted to make his 911 report anonymously, Sergeant Williams looked up the 911 caller's name and the informant confirmed that was his name. Further, the informant and Sergeant Williams knew of each other and confirmed as much during their phone call. Accordingly, Sergeant Williams knew the informant's identity—the informant was not anonymous in the sense of being unknown. Still, the informant was unproven because the informant had not provided information to Sergeant Williams before.

Typically, information from anonymous informants is less reliable than that from known informants, even if they are unproven. *See United States v. Scott*, 818 F.3d 424, 432 (8th Cir. 2016); *United States v. Kent*, 531 F.3d 642, 648-49 (8th Cir. 2008). Nevertheless, "under appropriate circumstances, [even] an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)). Whether the informant is anonymous, or known and unproven, courts engage in a totality-of-the-circumstances analysis to determine whether sufficient indicia of reliability exists. *See id.*; *United States v. Mays*, 993 F.3d 607, 615 (8th Cir. 2021); *United States v. Nolen*, 536 F.3d 834, 839-40 (8th Cir. 2008). *See also Illinois v. Gates*, 462 U.S. 213, 239 (1983) (abandoning earlier two-pronged test in favor of totality-of-the-circumstances analysis).

In analyzing the circumstances, courts often look to see whether the informant personally observed the crime they are reporting, whether they contemporaneously reported a crime, and whether they used the 911 emergency system. *See Navarette*, 572 U.S. at 400-401 ("A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity.").

In his motion to suppress, defendant argues that the tip here "fails" these factors, save for the use of the 911 system. (Doc. 28-1, at 8). The Court agrees that there is no indication that the informant personally observed the crime or contemporaneously reported it. But though the *Navarette* Court presented these factors as three "indicator[s] of veracity," the Court did not hold them out to be the only indicators. Indeed, Supreme Court precedent shows courts consider other factors to be important.

One such factor is whether the informant "accurately predict[s] future behavior" thereby demonstrating "a special familiarity with respondent's affairs," which show the informant had "access to reliable information about that individual's illegal activities." *Navarrete*, 572 U.S. at 398 (second and third quoting *White*, 496 U.S. at 332). *See also Florida v. J.L.*, 529 U.S. 266, 270 (2000). As discussed in *Navarette*, in *White*, "[t]he Supreme Court found an anonymous tip sufficiently reliable where officers could confirm details from the tipster's report, specifically that a woman would drive from a particular apartment building to a particular motel in a brown Plymouth station wagon with a broken right tail lite." 572 U.S. at 397 (describing the facts of *White*, 496 U.S. at 331). The thinking here is that "an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, 'including the claim that the object of the tip is engaged in criminal activity.'" *Id.* (quoting *White*, 496 U.S. at 331). In *J.L.*, the Supreme Court found another anonymous tip was not sufficiently reliable where officers could confirm only "bare-bones" description that the individual in question was wearing a plaid shirt. 529 U.S. at 268-271. Considering the totality of the circumstances in each case, the Court held the informant in *White* demonstrated a special familiarity with the suspect's affairs, and held the informant in *J.L.* did not.

In his motion to suppress, defendant argues that the Court's opinion in *J.L.* necessitates a finding that the informant's tip lacked sufficient reliability and officers failed to sufficiently corroborate the tip to make up for that deficiency. (Doc. 28-1, at

9-11).  But two key differences exist between the facts of *J.L.* and those presented here. First, the informant in *J.L.* remained anonymous, but the informant here did not.  Though the informant did not initially give officers his name when calling 911 with the tip about defendant, the informant did confirm his name when Sergeant Williams called back.  And though the informant wished to remain anonymous for purposes of the investigation, the fact remained that the informant gave his name to an officer meant that the informant knew he could be held accountable.  That the informant delayed in giving his name is ultimately inconsequential.  Whether the informant initially gave his name or did so later, if officers acted on a tip and it turned out to be unfounded, then the informant could be held accountable for making a false police report.  The Court presumes, as Judge Roberts did, that the informant knew this.  Of course, defendant is correct that the informant could also be held accountable for recanting and likely knew that, too.  But this does not mean the informant's tip was not credible.  Instead, it means the question of whether the informant's failure to recant tipped in favor or against reliability is a draw.  For this reason, the extent that Judge Roberts' finding depended on his reasoning that the informant did not recant despite knowing he could be held criminally responsible for providing false information, the Court sustains defendant's objection.  Nevertheless, other factors support that the informant's tip was reliable.

At the hearing and in his motion to suppress, defendant focused on the informant's criminal history as a reason to find the tip had low reliability.  (*See* Docs. 28-1, at 5-6; 39, at 43-53).  Criminal history is another factor in the totality-of-the-circumstances analysis.  *See United States v. Parker*, 836 F.2d 1080, 1083 (8th Cir. 1987) (stating that, in the context of an affidavit for a search warrant, "where an informant's information is at least partly corroborated, his credibility is established and it is not necessary to notify the magistrate of the informant's criminal history").

Here, the informant's criminal history is concerning, but it does not render the tip uncredible. Sergeant Williams was generally familiar with the informant's criminal history. He knew the informant's criminal history included convictions for drug dealing, firearms possession, armed robbery, aggravated battery, felony domestic abuse, strangulation, and assaults. Sergeant Williams also knew the informant was currently under investigation for human trafficking. Sergeant Williams did not run a report on the informant before pursuing the defendant, though he testified running the report would take 15 minutes and it appears undisputed that he had the time to do so. Because Sergeant Williams did not run the report, he did not know the informant had a 2021 conviction for interference with official acts and several other convictions. But none of these convictions were for crimes of dishonesty or false statements. Importantly, Sergeant Williams was unaware that the informant had been convicted of any crime of dishonesty or false statement. *See United States v. Reeves*, 210 F.3d 1041, 1045 (2000) ("Any crime involving dishonesty necessarily has an adverse effect on an informant's credibility."). *Cf.* FED. R. EVID. 609. Further, defendant points to no crime of dishonesty or false statement that Sergeant Williams would have discovered had he ran the informant's criminal history report. Based on the criminal history known to Sergeant Williams, it was not clearly unreasonable to rely on the informant's tip. Importantly, as discussed, Sergeant Williams corroborated much of the tip. Accordingly, he did not take the informant at his word; instead, he confirmed that several details of the tip were accurate and then reasoned that the parts he could not confirm—including that defendant was bringing drugs and guns from Chicago to Dubuque—were also accurate.

Defendant argues the informant's tip that defendant would be boarding the 10:30 bus from Chicago to Dubuque is a "description," not a prediction, because anyone would likely be able to tell from signs in the public bus station that the bus defendant was boarding was going to Dubuque. (Doc. 28-1, at 11). The Court agrees with defendant

that the situation here is not closely analogous as that in *White*, where an informant described a trip that a woman would travel from a particular apartment building to a particular motel in a private vehicle. Here, the informant reported that defendant was "on the 10:30 am bus"—from the report, it appears this referred to the arrival time in Dubuque. (Doc. 36-1, at 4). Accordingly, defendant was already on the bus at the time of the informant's call at 8:45 am. (*Id.*). Assuming, arguendo, that the informant's tip as to the bus was a description and not a prediction, the informant nevertheless gave other information that Sergeant Williams independently corroborated. This weighs in favor of reliability. *See United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013); *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995). For instance, the informant gave defendant's home address, including the specific number of defendant's residence. When Sergeant Williams corroborated the report, he found an ambulance responded to a call to aid defendant at the same address. The informant also stated that defendant had a history of PCP use. When Sergeant Williams corroborated that report, he found defendant had a drug overdose which was suspected to be from PCP. That these facts were unrelated to the actual crimes alleged does not prevent a finding of reliability; the point is, the informant's information proved accurate. *See United States v. Hanson*, No. CR09–4057–MWB, 2010 WL 1137486 at *9 (citing *United States v. Ketzeback*, 358 F.3d 987, 991, 992 (8th Cir. 2004) and *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1996)). *See also United States v. Williams*, 10 F.3d 590, 593-94 (8th Cir. 1993) (citing *Gates*, 462 U.S. at 233-34, and *Draper v. United States*, 358 U.S. 307, 313 (1959)). And though defendant was ultimately found with only one gun and no drugs, officers were assessing the tip based on what it claimed—that they would find guns and drugs on defendant's person.

For these reasons, to the extent that defendant objects to Judge Roberts' reliability finding, Judge Roberts appropriately evaluated the informant's tip with the scrutiny of a

known informant and correctly found that the informant's tip was reliable. Thus, any objection defendant makes as to the reliability finding is overruled. In sum, defendant's objection is sustained in part and overruled in part.

### E. *The Appropriate Standard*

Given that the Court found the seizure of defendant was not a de facto arrest, the appropriate standard is reasonable suspicion. Considering the totality of the circumstances, the Court finds officers had reasonable suspicion to perform a *Terry* stop on defendant.

"An investigatory, or *Terry*, stop without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot." *Navarrete–Barron*, 192 F.3d at 790 (8th Cir. 1999) (citing *Terry v. Ohio*, 392 U.S. 1, 25-31 (1968)). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause." *Navarrete v. California*, 572 U.S. 393, 397 (2014) (citations omitted). "Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)). As discussed, "unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *Kent*, 531 F.3d at 648. Again, indicia of the reliability of an unproven informant's tip includes personal observation of the crime, predictions of future behavior, detailed descriptions of the alleged crime, officers' independent corroboration of the information provided, contemporaneous reporting of the events, and use of the 911 emergency system. *See Navarrete*, 572 U.S. at 398-400; *Manes*, 603 F.3d at 456.

As described above, the informant did not personally observe the crime and the informant did not contemporaneously report it. The informant did, however, use the 911

emergency system.  Though the informant asked to remain anonymous—both in the call to 911 and the call with Sergeant Williams—the informant confirmed his name and the informant and Sergeant Williams both confirmed to one another that they knew who the other person was.  Accordingly, less corroboration was needed for the informant's tip to be usable.  *See Scott*, 818 F.3d at 432.  Though the informant's tip did not demonstrate a predictive behavior to the degree of "special familiarity," the information presented to Sergeant Williams did generally match when he went to corroborate it.  He matched defendant's name from the tip to the bus manifest, though he could not confirm that defendant was actually on the bus.  Sergeant Williams also corroborated that defendant had convictions for guns and violent offenses and an incident that suggested he used PCP.  He also found that defendant was recently associated with the address provided by the informant and confirmed that photos of defendant matched the informant's description that he was a Black male who was approximately six feet tall.  These corroborated details made it reasonable for Sergeant Williams to believe that the other information in the tip—that defendant was bringing guns and drugs—were also true.[13]

Also, as discussed, the informant's criminal history was concerning, but it did not include crimes of dishonesty.  Again, defendant argues that the informant's criminal

---

[13] It is true that other information in the tip did not turn out to be accurate.  For instance, defendant got off the bus carrying only one bag—his backpack—not bags, plural.  Further, defendant did not have drugs in his possession and had only one gun, not guns, plural.  Also, when officer seized defendant, he was walking down the street away from the bus station, not in an Uber or waiting for an Uber in keeping with the informant's prediction that defendant would take an Uber.  Thus, the informant was wrong in several ways.  But, importantly, Sergeant Williams could not corroborate whether defendant was carrying multiple bags, whether defendant possessed drugs or guns and if so, how many, or whether defendant would take an Uber before stopping defendant.  Thus, these inaccuracies do not affect the corroboration Sergeant Williams needed to undertake or the predictive behavior in the informant's tip that was verifiable by Sergeant Williams.

history should have resulted in Sergeant Williams not giving credence to the tip, but precedent does not require this.

Viewing the circumstances collectively, the Court finds the officers had reasonable suspicion to perform a *Terry* stop on defendant because they had reasonable and articulable suspicion that criminal activity may be afoot. *See Navarrete–Barron*, 192 F.3d at 790; *Navarette*, 572 U.S. at 397. Thus, defendant's objection is overruled.

### F. Reliance on *Navarette* and Manes

The Court finds Judge Roberts' reliance on *Navarette* and *Manes* appropriate. The analysis in those cases focused on reasonable suspicion because the court found the seizure was a *Terry* stop. Here, the Court has found the seizure of defendant was a *Terry* stop and thus, the relevant standard is reasonable suspicion. Accordingly, reliance on *Navarette* and *Manes* is appropriate. Thus, defendant's objection is overruled.

### V. CONCLUSION

For the reasons set forth above, defendant's objections (Doc. 42) are **sustained in part and overruled in part**. The Court **adopts** Judge Roberts' R&R (Doc. 38) and **denies** defendant's Motion to Suppress (Doc. 28).

**IT IS SO ORDERED** this 26th day of June, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa